### BARR LABORATORIES, INC., Plaintiff,

v.

### Tommy G. THOMPSON, et al., Defendants.

### No. CIV.A. 02–1867(EGS).

United States District Court, District of Columbia.

Dec. 18, 2002.

Andrew E. Clark, Esquire, Office of Consumer Litigation, United States Department of Justice, Washington, DC.

Gordon A. Coffee, Esquire, Winston & Strawn, Washington, DC.

Kurt L. Schultz, Esquire, Christine J. Siwik, Esquire, Emily C. Singley, Esquire, Winston & Strawn, Chicago, IL.

Mark Lynch, Esquire, Covington & Burling, Washington, DC.

**MEMORANDUM OPINION**

SULLIVAN, District Judge.

Plaintiff, Barr Laboratories, Inc. ("Barr Labs" or "Barr"), commenced this action against the Secretary of Health and Human Services (Tommy Thompson), the Deputy Commissioner of Food and Drugs (Lester Crawford), and the U.S. Food and Drug Administration ("FDA")to enjoin the FDA from refusing to recognize plaintiff's Abbreviated New Drug Application ("ANDA") as finally approved on April 1, 1987, and as effective on August 20, 2002. In addition, plaintiff seeks to enjoin the agency from taking any action to prevent Barr from immediately marketing a generic 10 mg *tamoxifen citrate* product ("tamoxifen") under Barr's ANDA No. 70–929. AstraZeneca Pharmaceuticals ("Astra") intervened on behalf of federal defendants.

Without objection from the parties, the Court consolidated plaintiff's request for injunctive relief with the proceedings on the merits in accordance with Fed. R.Civ. P.65(a)(2). Pending before the Court are cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56. Upon consideration of the parties' motions, oppositions, replies and oral arguments, as well as the statutory and case law governing the issues, and for the following reasons, the Court concludes that defendants' and intervenor's motions for summary judgment are **GRANTED** and plaintiff's motion for summary judgment is **DENIED**.

**Background**

Essentially, the Court is required to consider the legal effect of a letter issued by the FDA on April 1, 1987. Plaintiff alleges that the letter contained a "final approval" of its application to market a generic version of the breast cancer drug *tamoxifen citrate* on August 20, 2002. It claims that the FDA violated the Federal

Food, Drug and Cosmetic Act ("FDCA") and acted arbitrarily, capriciously and in a manner otherwise contrary to law under the Administrative Procedure Act ("APA") by "converting" the FDA's 1987 final approval of its Abbreviated New Drug Application into a "tentative" approval and preventing the marketing of its 10mg *tamoxifen citrate* tablets before expiration of AstraZeneca's newly acquired pediatric exclusivity. Thus, plaintiff challenges the validity of the FDA's decision to award to Astra a six-month pediatric exclusivity extension for *tamoxifen*.

Defendants contend that plaintiff never received "final" approval of its application to market *tamoxifen* and that such approval cannot become effective until the conclusion of Astra's pediatric exclusivity provision. According to defendants, the effective date of approval for each generic applicant was subject to a period of delay pending the expiration of Astra's patent protection. They maintain that, as of the date Astra received its six-month pediatric extension, no generic applicant's approval had gone into effect. Semantic differences aside, defendants claim, plaintiff is on identical legal and equitable footing as its generic competitors, who must wait until the expiration of Astra's pediatric exclusivity before marketing their products.

**Statutory Scheme**

*I. Abbreviated New Drug Approval*

Prior to 1984, FDA approval of a new drug application was granted without reference to intellectual property rights or interests. Congress recognized that periods of market exclusivity would provide valuable incentives for drug manufacturers to engage in the research and development

of new drugs. *See* H.R.Rep. No. 98–857, Pt. I, 98th Cong., 2d Sess. at 15, *reprinted in* 1984 U.S.C.C.A.N. 2647, 2648. Moreover, the legislators understood that the goal of encouraging innovation had to be balanced against that of promoting competition. *See id.* at 14. With the objective of addressing both concerns, Congress passed the Drug Price Competition and Patent Term Restoration Act, generally known as the Hatch–Waxman Amendments, in 1984.[1] The Hatch–Waxman Amendments created a system for FDA review and approval of applications to market generic versions of previously approved drugs. Specifically, Hatch–Waxman eliminated the requirement that companies seeking to market a generic drug duplicate human clinical tests and established, in its place, the "ANDA" process.

Under the Federal Food, Drug and Cosmetic Act, a company seeking to market a drug that has never been approved in the United States must submit a New Drug Application ("NDA") to the FDA. Under the Hatch–Waxman Amendments, a company may obtain FDA approval to market a generic version of a previously approved drug by submitting an ANDA demonstrating, *inter alia*, that the generic version of the drug is the same as ("bioequivalent" to) the NDA-approved version of the drug.[2]

The FDCA requires an ANDA applicant seeking approval of a generic drug to reference the specific listed drug that it intends to duplicate. *See* 21 U.S.C. § 355(j)(2)(A). "Listed drugs" are new drug products that have been approved under the FDCA for safety and effectiveness and that have not been withdrawn

---

1. Congress added these provisions to the FDCA via Pub.L. No. 98–417, 98 Stat. 1585 (1985), codified at 21 U.S.C. § 355(j).

2. Bioequivalence means that the generic drug delivers the same amount of the active ingredient at the same rate and extent to the body as the innovator drug.

from sale for reasons of safety and effectiveness. *See* 21 C.F.R. § 314.3(b). A "drug product" is a finished dosage form that contains a drug substance generally in association with one or more ingredients. *See id.* A "drug product" is an "active ingredient that is intended to furnish pharmacological activity or other direct effect ... but does not include intermediates used in the synthesis of such ingredient." *Id.*

The ANDA applicant must also submit information to show that "the route of administration, the dosage form, and the strength of the new drug are the same as those of the listed drug." *See* 21 U.S.C. § 355(j)(2)(iii). The FDA has concluded that each strength of a drug product is a separately listed drug. *See, e.g., Apotex, Inc. v. Shalala,* 53 F.Supp.2d 454, 456 (D.D.C.1999), *aff'd,* 1999 WL 956686 (D.C.Cir.1999).

Under the FDCA, an ANDA must also contain a "certification" with respect to each patent that claims the pioneer drug or the method of the drug's use. *See* 21 U.S.C. § 355(j)(2)(A)(vii). The certification must state one of the following:

(I) that the required patent information relating to such patent has not been filed;

(II)that such patent has expired;

(III) that the patent will expire on a particular date;

(IV) that such patent is invalid or will not be infringed upon by the drug for which approval is being sought.

If certification is made under paragraphs I or II indicating that patent information pertaining to the drug or its use has not been filed with the FDA or that the patent has expired, approval of the

ANDA may be made effective immediately. *See* 21 U.S.C § 355(j)(5)(B)(i). A certification pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(III), or a "paragraph III certification," certifies that the ANDA applicant seeks approval to market a product after expiration of the patents listed in the Orange Book.[3] A paragraph IV certification requires that the ANDA applicant give notice of the filing of the ANDA to the patent owner and the ANDA holder for the listed drug. The notice must include a detailed statement of the legal and factual bases for the applicant's opinion that the patent is either invalid or will not be infringed. *See* 21 U.S.C. § 355(j)(2)(B); 21 C.F.R. § 314.95. The FDA may approve an ANDA with a paragraph IV certification, and the approval may become effective immediately, despite the unexpired patent, unless an action for patent infringement is brought against the ANDA applicant within 45 days of the date on which the patent owner and the NDA holder receive notice of the paragraph IV certification. *See* 21 U.S.C. § 355(j)(5)(B)(iii); 21 C.F.R. § 314.107(f)(2). If a patent action is brought within 45 days of the notice, approval of the ANDA will not become effective until at least 30 months from the date of receipt of notice unless a final decision is reached earlier in the patent case or the patent court mandates a longer or shorter period. *See* 21 U.S.C. § 355(j)(5)(B)(iii).

*II. Pediatric Exclusivity Provision*

In 1997, Congress amended the FDCA in order to provide economic incentives for drug manufacturers to conduct pediatric studies of drugs. The so-called "pediatric exclusivity" provision, 21 U.S.C. § 355(a), rewards drug manufacturers with a six-

---

**3.** The Orange Book lists FDA-approved drug products with therapeutic equivalence evalua- tions.

month extension of pre-existing market protection in return for conducting pediatric studies at the FDA's request. If the FDA makes a request and the NDA holder satisfies that request's requirements, pediatric exclusivity provides for a six-month delay in the effective date of pending ANDAs. *See* 21 U.S.C. § 355a(c)(2)(A). When pediatric exclusivity is awarded, the statute attaches six months to any exclusivity or patent protection already in place for the drug in question.

**Facts**

Following the passage of the Hatch–Waxman Amendments in 1984, Congress directed the FDA to promulgate necessary regulations through notice and comment rulemaking under the APA. *See* Pub.L. No. 98–417, 98 Stat. 1585, at § 105(a)(1984). Until such time as the FDA adopted final regulations, Congress authorized the Agency to review and approve ANDAs under its then-existing regulations. *Id.*

In 1985, the FDA's regulations provided that the "date of the agency's approval letter is the date of approval of the application." 21 C.F.R. § 314.105(a) (1985). The text of the provision remained unchanged in 1987. 21 C.F.R. § 314.105(a) (1987).

AstraZeneca holds the New Drug Application for *tamoxifen citrate* and sells the product under the brand name of Novaldex®. An affiliate of Astra holds United States patent No. 4,536,516 (the " '516 patent").[4]

On December 19, 1985, plaintiff filed an ANDA seeking FDA approval to market a generic copy of Astra's 10 mg *tamoxifen citrate* tablet. Plaintiff's ANDA contained a paragraph III certification to Astra's

516' patent under 21 U.S.C. § 355(j)(2)(A)(vii)(III), indicating that plaintiff did not intend to begin marketing the product until the date of Astra's patent expiration.

On April 1, 1987, FDA issued a letter "approv(ing)" Barr Labs' 10 mg. *tamoxifen* ANDA. The letter stated, in part:

> We have completed the review of this abbreviated application and have concluded that the drug is safe and effective for use as recommended in the submitted labeling. Accordingly, the application is approved; however the effective date of approval is delayed until August 20, 2002 pursuant to 21 U.S.C. 355(j)(4)(B) relating to patent rights.

Following receipt of the FDA's letter, plaintiff's *tamoxifen* product was listed in the agency publication *Approved Drug Products with Therapeutic Equivalence Evaluations* with an approval date of April 1, 1987 and an effective date of August 20, 2002.

On September 16, 1987, plaintiff changed its paragraph III certification to a paragraph IV certification, indicating its intent to challenge Astra's '516 patent. On November 2, 1987, in response to plaintiff's paragraph IV certification, Astra filed suit against plaintiff, thereby triggering a 30–month stay of approval of plaintiff's Abbreviated New Drug Application. On March 15, 1990, the FDA sent plaintiff a letter indicating that the 30–month stay of approval was due to expire on March 29, 1990 and that the effective date of its ANDA approval had been modified from August 20, 2002 to March 29, 1990. In a letter dated March 20, 1990 plaintiff acknowledged receipt of the FDA's letter modifying the effective date of its ANDA

---

**4.** For simplicity, Astra will be referred to henceforth as the NDA holder and the owner of the '516 patent.

and informed the Agency that its patent litigation was ongoing and would not be resolved prior to the newly established effective date. On March 21, 1990 the FDA received a copy of a March 13, 1990 stipulation by the parties in the patent litigation. The stipulation stated that the 30–month approval stay would be extended until the date of final judgment in the patent case, but for no longer than six months from March 25, 1990.

On July 10, 1989, the FDA proposed regulations to implement Hatch–Waxman. *See* Abbreviated New Drug Application Regulations, 54 Fed.Reg. 28872 (proposed July 10, 1989). The proposal contained the following suggested regulation:

> FDA will approve an abbreviated new drug application and send the applicant an approval letter if none of the reasons . . . for refusing to approve the . . . application apply. The date of the agency's approval letter is the date of approval of the abbreviated new drug application. A new drug product approved under this paragraph may not be introduced . . . into interstate commerce until approval . . . is effective. Ordinarily, the effective date of approval will be stated in the approval letter.

In June of 1992, FDA's final regulations became effective. *See* 57 Fed.Reg. 17950 (Apr. 28, 1992) (codified at 21 C.F.R. § 314). In contrast to the 1989 proposed regulations, the final provisions referred to "tentative" ANDA approval:

> FDA will approve an abbreviated new drug application and send the applicant an approval letter if none of the reasons in § 314.127 for refusing to approve the abbreviated new drug application apply. The approval becomes effective on the date of the issuance of the agency's approval letter unless the approval letter provides for a delayed effective date. An approval with a delayed effective date is tentative and does not become final until the effective date. A new drug product approved under this paragraph may not be introduced or delivered for introduction into interstate commerce until approval of the abbreviated new drug application is effective. Ordinarily, the effective date of approval will be stated in the approval letter.

57 Fed.Reg. 17950, 17989 (Apr. 28, 1992) (adopted 21 C.F.R. § 314.105(d)).

On April 7, 1993, plaintiff informed the FDA that it had settled its patent litigation with Astra. Plaintiff withdrew its paragraph IV certification to the '516 patent as part of the settlement agreement and submitted in its place a new paragraph III certification. This change reset the effective date for plaintiff's marketing of *tamoxifen* to August 20, 2002, the date corresponding to Astra's patent expiration. As part of the patent litigation settlement, plaintiff and Astra entered into a distribution and supply agreement, whereby plaintiff obtained the right to market Astra's *tamoxifen* product under its name. Since 1993, therefore, plaintiff has been marketing a "generic" *tamoxifen* product under its own label.

Since the 1993 settlement, the validity and enforceability of the '516 patent have been upheld twice by federal district courts in two fully litigated cases involving other parties who filed *tamoxifen citrate* ANDAs. In the case of *Zeneca Ltd. v. Novopharm Ltd.,* 111 F.3d 144 (Fed.Cir. 1997), the District Court of Maryland rejected Novopharm's claim of invalidity and the Federal Circuit affirmed. In *Zeneca Ltd. v. Pharmachemie B.V.,* 37 F.Supp.2d 85 (D.Mass.1999), the defendant similarly asserted that the '516 patent was invalid and unenforceable. Following a trial, the District of Massachusetts ruled that the '516 patent was valid, enforceable and infringed by Pharmachemie. *See Zeneca*

*Ltd. v. Pharmachemie B.V.,* 37 F.Supp.2d 85 (D.Mass.1999).

In 1997, Congress passed the Food and Drug Administration Modernization Act ("FDAMA"), which included among its terms pediatric exclusivity provisions. 21 U.S.C. § 355(a).

In a letter to the FDA dated September 4, 1998, plaintiff stated that:

On March 15, 1990, FDA granted *tentative approval* for Barr's tamoxifen ANDA. Since Barr settled with ICI to avoid the risk of reversal on appeal, Barr cannot obtain final approval until the '516 patent is either defeated or expires. Nevertheless, Barr stands ready and waiting for the first opportunity to obtain *final approval* and to market its own generic version of tamoxifen. Thus, Barr has "actively pursued" approval and has, in fact, received tentative approval (emphasis added).

On April 5, 2000, after determining that additional pediatric information relating to *tamoxifen citrate* "may produce health benefits in the pediatric population," the FDA issued a written request asking Astra to undertake pediatric studies on *tamoxifen citrate* pursuant to the pediatric exclusivity provision.

On February 28, 2002, Astra filed a supplement with the FDA that included reports related to the requested pediatric studies and asked the Agency for a pediatric exclusivity determination. On May 16, 2002, FDA's pediatric exclusivity board met with the reviewing division and concluded that Astra's studies responded adequately to the Agency's request, were conducted in accordance with commonly accepted scientific principles, and were submitted within the time frame contemplated by the FDA. Accordingly, the FDA granted Astra six months of pediatric exclusivity. Astra's exclusivity attached to the existing '516 patent and extended Astra's right to sell *tamoxifen citrate* tablets from the original patent expiration date of August 20, 2002 to February 20, 2003.[5]

Since 1987, plaintiff has filed annual reports relating to its ANDA. The FDA never advised plaintiff that it was not required to submit these reports. Since the issuance of the FDA's April 1987 letter, plaintiff has supplemented its ANDA in accordance with the instructions contained in the letter and pursuant to Agency regulations. The FDA accepted plaintiff's supplements and periodically reminded plaintiff to "comply with the requirements for an approved abbreviated new drug application ..."

Once an application is approved, the FDA can only withdraw approval pursuant to 21 U.S.C. § 355(e). The FDA has never withdrawn the approval of Barr's *tamoxifen* ANDA in accordance with this regulation.

On August 16, 2002, plaintiff wrote to the FDA requesting confirmation that it could begin marketing its generic *tamoxifen* product on August 20, 2002. By letter dated September 20, 2002, the Agency rejected plaintiff's request, concluding that its ANDA approval could not become effective until after February 20, 2003, the date upon which Astra's exclusivity period is due to expire.

On September 23, 2002, plaintiff filed a motion with this Court seeking injunctive relief and to enjoin the FDA from refusing to recognize its ANDA as finally approved on April 1, 1987, and as effective as of August 20, 2002. In addition, plaintiff

---

**5.** Beginning in 1994, generic manufacturers in addition to Barr filed ANDAs for *tamoxifen citrate*. These ANDAs have been tentatively approved under the 1992 regulations, and the FDA has determined that they are subject to Astra's right to pediatric exclusivity.

sought to enjoin the Agency from taking any action to prevent it from immediately marketing its generic *tamoxifen citrate* product. At a status conference held on October 8, 2002, the Court consolidated the trial on the merits with the hearing on the application for injunctive relief pursuant to Fed.R.Civ.P. 65(a)(2).[6] At plaintiff's request, the Court directed that plaintiff's motion for injunctive relief be converted into a motion for summary judgment and that the FDA and AstraZeneca file cross-motions for summary judgment under Fed.R.Civ.P.56.

## Standards of Review

### I. Summary Judgment

Summary judgment should be granted pursuant to Fed.R.Civ.P.56 only if the moving party has demonstrated that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). When ruling upon a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538(1986); *Bayer v. United States Dep't of Treasury,* 956 F.2d 330, 333 (D.C.Cir.1992). Likewise, when ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *Rhoads v. McFerran,* 517 F.2d 66, 67 (2d Cir.1975). The cross-motions pending before the Court present no genuine disputes of material facts precluding summary judgment.

### II. The Administrative Procedure Act

The FDA's actions are subject to judicial review under the Administrative Procedure Act ("APA"). Under the APA, an agency's actions will be upheld unless the reviewing court finds that the choice made by the agency was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *Sultan Chemists, Inc. v. EPA,* 281 F.3d 73, 78–79 (3d Cir.2002). Agency action is defined as "the whole or part of an agency rule, order, license, sanction, relief or the equivalent, or denial thereof, or failure to act." 5. U.S.C. § 551(13). A court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (quoting 5 U.S.C. § 706(2)(A)). Although the inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The arbitrary and capricious standard is highly deferential, and the court is not empowered to substitute its judgment for that of the agency. *Id.* The D.C. Circuit has noted that the agency in question "must be afforded the amount of time necessary to analyze such questions so that it can reach considered results in a final [decision] that will not be arbitrary and

---

6. Fed.R.Civ.P. 65(a)(2) provides a means of securing an expedited decision on the merits and permits a court to "order the trial on the action on the merits to be advanced and consolidated with the hearing of the application." Before the Court can issue such an order, "the parties should normally receive clear and unambiguous notice [of the court's intent

consolidate the trial and the hearing] either before the hearing commences or at a time which will still afford the parties a full opportunity to present their respective cases." *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175(1981) (citations omitted).

capricious or an abuse of discretion." *Sierra Club v. Thomas*, 828 F.2d 783, 798 (D.C.Cir.1987).

### Analysis

The central issue in this case is whether the 1987 approval granted plaintiff's product constituted a "final" approval with a specific effective marketing date. Plaintiff argues that it did and, consequently, that the FDA violated the FDCA and acted arbitrarily, capriciously and otherwise contrary to law under the APA by refusing to recognize the finality of the approval and by "converting" that final approval into a "tentative" approval on a retroactive basis.

Plaintiff's argument is based on four claims: (1) Plaintiff had a "vested right" under the 1987 implementing regulations of the FDCA to begin marketing *tamoxifen* on August 20, 2002; (2) The pediatric exclusivity provisions of the FDAMA do not apply retroactively to plaintiff's ANDA; (3) The FDA's "tentative approval" regulation cannot lawfully apply to plaintiff's ANDA; and (4) The FDCA independently prevents the FDA from altering the "finally approved" status of plaintiff's drug application. The Court will address each claim in turn.

### A. Claim I: Did the FDA's Approval Letter Give Plaintiff a "Vested Right?"

█ Regulations issued in 1985 governing the FDA's approval of drug applications provide, in relevant part:

> The Food and Drug Administration will approve an application and send the applicant an approval letter if none of the reasons in § 314.125 for refusing to approve the application apply. The date of the agency's approval letter is the date of approval of the application.

21 C.F.R. § 314.105 (1985).

Plaintiff argues that, under the regulations in place in 1987, which reflected those promulgated in 1985, the FDA's 1987 approval letter concluded the Agency's review of plaintiff's *tamoxifen* ANDA and entitled plaintiff to begin marketing its generic product on August 20, 2002. Plaintiff further contends that, prior to 1992, an applicant who received an approval letter could simply launch its product on the delayed effective date described therein. Conversely, under the "tentative" approval regime instituted in 1992, the applicant is expressly required to file a final approval letter and is prohibited from marketing its product pending its receipt. Plaintiff asserts that this tentative approval concept represented a major regulatory change that "fundamentally" altered the legal landscape. Pl.'s Mem. Supp. Summ. J. at 12.

Plaintiff challenges the FDA's argument that the 1992 implementing regulations merely codified pre-existing policy. According to plaintiff, the Agency's position runs directly contrary to the pre–1992 regulatory scheme and the court-sanctioned interpretation of that regime. Plaintiff maintains that the FDA continuously interpreted its pre–1992 regulations as providing that an application was "approved" on the date of the agency's approval letter.

Plaintiff argues that, in light of the pre–1992 regulations, it would have been *unlawful* for the FDA to adopt a "policy" under which an approval with a delayed effective date was treated in the same manner as a tentative approval. Such a policy, according to plaintiff, would have contradicted the FDA's then-extant regulations in violation of the "well-settled rule that an agency's failure to follow its own regulations is fatal to the deviant action." *IMS, PC v. Alvarez*, 129 F.3d 618, 621 (D.C.Cir.1997).

In its statement of undisputed facts, plaintiff relies on the unpublished ruling of the New Jersey District Court in the case of *Chase Laboratories, Inc. v. Sullivan*,

No. 90–3428(NHP) (D.N.J. Sep. 4, 1990). The case involved an August, 1990 letter issued by the FDA to Chase Labs rescinding a July, 1989 letter granting approval to Chase's drug manufacturing application. The District Court issued a written order declaring "null and void, and without force and effect of law," the FDA's second letter. The Court concluded that the FDA's original letter contained a "final" drug application approval.

In addition to judicial precedent and prior agency action, plaintiff looks to the FDA's actions in the present case to argue that applications filed prior to 1992 should be treated differently than those filed under the present regime. Specifically, it points to differences between the pre–1992 and post–1992 approval letters. While the latter referred explicitly to "tentative" approval, the former indicated that no further agency action was required as a condition precedent to marketing. Plaintiff avers that "the changes in the post–1992 approval letters reflect the significant differences between a pre–1992 ANDA with a delayed effective date and a 'tentatively' approved application." Pl.'s Mem. Supp. Summ. J. at 17.

Finally, as further evidence that the FDA's regulatory scheme underwent fundamental change in 1992, plaintiff points to accompanying changes in the agency's Orange Book. Plaintiff notes that the FDA included its product in the 7th edition of the Orange Book, listing an approval date as April 1, 1987 and an effective date of August 20, 2002. It further notes that, after the 1991 changes in the criteria for Orange Book listing, requiring that only applications with an effective approval would be included, the FDA removed plaintiff from the list. Had the FDA always maintained that a delayed effective date was tantamount to "tentative" ap-

proval, argues plaintiff, the change would have been unnecessary. *Id.* at 18.

In response to plaintiff's contention that the approval granted in FDA's 1987 letter constituted "final" approval and bestowed on plaintiff a "vested right," defendants argue that plaintiff never had a legal right to bring its product to market on the *specific* effective date identified in the 1987 approval letter. Defendants identify the central question as whether the FDA properly determined that, because plaintiff's ANDA had been approved with a delayed effective date, and because the approval had not yet become effective when Astra was awarded pediatric exclusivity, the earliest date that plaintiff's ANDA can be made effective is the date upon which Astra's exclusivity is due to expire. Defs'. Mem. Supp. Summ. J. at 2.

The Court is persuaded by defendants' argument that the 1987 approval letter specifically alluded to circumstances that could "impact upon" or "change" the "effective date of approval." In addition, they maintain that, under the FDCA, only persons with effective approvals are permitted to market their drugs. *See* 21 U.S.C. § 355(a) ("No person shall introduce or deliver for introduction into interstate commerce any new drug unless an approval filed pursuant to subsection (b) or (j) is effective with respect to such drug.") "Significant events" occurring prior to the effective date can, and often must, delay the effective date of ANDA approvals.

Indeed, the legal consequences stemming from regular ANDA approvals are not comparable to those stemming from NDA approvals or ANDA approvals without delayed effective dates. While certain benefits may flow even from ANDA approvals with delayed effective dates, they are in no sense tantamount to the benefits accruing when NDAs or ANDAs are approved with immediate effective dates.

"Whatever rights or benefits Barr acquired as a result of FDA's 1987 approval letter," defendants argue, "they certainly did not include an inalterable vested legal right to go to market on August 20, 2002 ..." Defs.' Mem. Supp. Summ. J. at 5.

Defendants expend considerable effort distinguishing the *Chase* case from the case at bar. They argue that the attempted rescission in *Chase* was based on new inspectional findings that called into question the validity of the bioavailability studies that had been submitted in support of the ANDA. While defendants disagree with the district court's ruling, they allege that even the court in *Chase* did not find that the FDA had violated any of plaintiff's "vested rights." In this regard, defendants contend that "...although the court found that Chase's approval was 'final' when the approval letter issued despite its delayed effective date, the court nonetheless recognized that the effective date itself was indefinite and subject to change..." *Id.* at 7.

Intervenor AstraZeneca identifies the question in the present case as "whether Barr's ANDA stood as finally approved in the Spring of 2002, when AstraZeneca was awarded pediatric exclusivity." Int.'s Mem. Supp. Summ. J. at 9. Astra further states that the question, which turns on the effect of plaintiff's 1993 paragraph III certification under then-existing regulations and the significance of the FDA's 1987 letter," is plainly a matter of agency procedures for which FDA is entitled to great deference." *Id.* at 9. The intervenor argues that the deference owed the FDA in the present case is "further heightened by the 'complex and highly technical regulatory program' involved." *Id.* at 10, *citing Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994).

Astra's argument focuses to a significant degree on plaintiff's 1993 paragraph III certification, which it claims places plaintiff's ANDA within the 1992 "tentative approval regulations." Despite plaintiff's arguments to the contrary, Astra claims that, under FDA regulations, plaintiff's revised patent registration is highly relevant:

> An applicant shall submit an amended certification by letter or as an amendment to a pending application or by letter to an approved application. Once an amendment or letter is submitted, the application will no longer be considered to contain the prior certification.

Int. Mem. Supp. Summ. J. at 10, *citing* 21 C.F.R. § 314.94(a)(12)(viii).

Astra alleges that, following plaintiff's submission of its 1993 paragraph III certification, its ANDA was "no longer considered to contain the prior certification." Int. Mem. Supp. Summ. J. at 10. In addition, it maintains that the FDA did not abuse its discretion in finding that, "[g]iven that Barr's current paragraph III certification was made in 1993, Barr can no longer contend that its final approval predates and therefore should not be subject to the 1992 Final Rule." Int.s' Mem. Supp. Summ. J. at 11, *citing* AR at 0005.

Astra further alleges that, under established agency policy, recertification under paragraph III has the effect of changing an existing approval for even a finally approved ANDA to a tentative approval. In March, 2002, as a result of a recertification under paragraph III, the FDA altered the status of Pharmachemie and Mylan's ANDA from final to tentative approval and determined that

> should AstraZeneca submit studies that qualify for pediatric exclusivity ... tentative approval status for Pharmachemie and Mylan will permit FDA to delay final approval of these ANDAs containing paragraph III certifications until ex-

piration of the six-month exclusivity period . . . .

Int.s' Mem. Supp. Summ. J. at 11, *citing* AR at 0216.

It is Astra's view that this policy, which plaintiff concedes properly applies to Pharmachemie and Mylan, should apply equally to plaintiff's ANDA. In essence, Astra argues that the policy mandates an effective date of approval for all such ANDAs no earlier than six months following patent expiration.

Astra claims that, regardless of the certification issue, plaintiff's approval was in any case tentative. Similarly to the FDA, it argues that the 1987 "approval with delayed effectiveness date" issued by the agency was not a "final" approval because the agency's pre–1992 practice was not substantially different from the practice adopted in 1992. Astra maintains that "all of the contemporaneous evidence supports FDA, not Barr." Int.'s Mem. Supp. Summ. J. at 12. Astra points to the fact that, when the FDA adopted its 1992 regulations, it expressly stated that those regulations "clarified that an approval with delayed effective date is tentative and does not become final until the effective date." Int.s' Mem. Supp. Summ. J. at 12, *citing* 57 Fed.Reg. 17950, 17967 (April 28, 1992). In addition, Astra emphasizes that the text of the regulation itself declares that: "(a)n approval with delayed effective date is tentative and does not become final until the effective date." Int.s' Mem. Supp. Summ. J at 12, *citing* 21 C.F.R. § 314.105(d).

Based on the language of the regulations and the agency's policy and practice, Astra contends that the evidence clearly shows that the modifications made in 1992 did not fundamentally alter the nature of ANDA approvals. Astra notes that, at the time the 1992 regulations were adopted, the Agency interpreted them as codifying and clarifying prior practice. It further main-

tains that this interpretation is entitled to substantial deference and "must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Int.s' Mem. Supp. Summ. J. at 12, *citing Thomas Jefferson Univ.,* 512 U.S. at 512, 114 S.Ct. 2381.

As a final argument, Astra claims that, in the period following implementation of the 1992 regulations, plaintiff's own representations indicated that it had received only a "tentative" approval.

The dispute over whether the FDA's 1987 approval letter granted plaintiff any "vested right" presents no genuine issue of material fact. The parties do not disagree over the facts surrounding the letter, but rather over the legal meaning that should attach to them. While plaintiff and defendants dispute whether the FDA's actions were consistent with a "final" approval and whether plaintiff's actions, on the other hand, were consistent with a "tentative" approach, that disagreement distracts from the central issue. The precise question the Court must address is whether the FDA's "approval" letter vested plaintiff with an *unqualified* legal right to begin marketing *tamoxifen on a specific date.*

 Whether plaintiff had a vested right to market *tamoxifen* on August 20, 2002 under the FDCA's implementing regulations is a matter of statutory construction. In reviewing an agency's interpretation of a statute that it is charged with administering, the Court must be guided by the framework established in the 1984 case of *Chevron U.S.A. Inc v. NRDC. See Natural Resources Defense Council, Inc. v. Browner,* 57 F.3d 1122, 1125 (D.C.Cir. 1995). Under the *Chevron* two-step test, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Con-

gress." *Chevron,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). "[I]f the statute is silent or ambiguous with respect to the specific issue, [however,] the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. A court does not reach this second step if, "employing traditional tools of statutory construction, [it] ascertains that Congress had an intention on the precise question at issue ..." If Congress had such an intention, that intention is the law and must be given effect. *Id.* at 843 n. 9, 104 S.Ct. 2778.

While the term "approved" is not defined in the relevant statute, the U.S. Court of Appeals for the District of Columbia has found that the term had "at the time the Hatch–Waxman Amendments were enacted, a precise and undisputed meaning." *Mead Johnson Pharmaceutical Group, Mead Johnson & Co. v. Bowen,* 838 F.2d 1332, 1337 (D.C.Cir.1988). By regulation, the FDA has specified that the applicant "shall be notified in writing that the application is approved and the application shall be approved on the date of the notification." 21 C.F.R. § 314.105 (1981). The FDA "approval" referenced in the regulations, however, requires merely that a drug be "safe and effective," *not* that no further barriers remain in place delaying that drug's marketability. Under the FDCA, a generic drug can only be approved for marketing if it is the same as the innovator product in virtually all particulars. *See* 21 U.S.C. § 355(j)(2)(B)(4). As federal defendants note:

> ... if, before the effective date of ANDA approval, FDA approves material changes to the formulation or labeling of the innovator product, the generic applicant must also make such changes to its product ... (T)here is nothing in either the statute, the regulations, or FDA policy, that permits or authorizes a drug manufacturer to bring to market a drug that does not comply with all applicable ... requirements.

Defs.' Mem. Supp. Summ. J. at 11.

Dangerous consequences would flow from the application of the *Chase* rationale to cases in which an ANDA's approval will not become effective for a significant period of time following the FDA's original letter. "Because application of the *Chase* rationale in such cases would permit an ANDA approval to become effective under circumstances in which it no longer meets the statutory criteria for approval," allege defendants, "this case vividly illustrates why an ANDA approval cannot and should not be considered 'final' until the approval takes effect." *Id.* Plaintiff's unqualified right theory would remove from the FDA's jurisdiction even the question whether plaintiff can launch its drug without addressing the labeling deficiencies identified by the Agency. The Court is persuaded by intervenor's argument that "(i)t strains credulity to suppose that FDA would have intended to confer such an unqualified *right to introduce a drug product in the market 15 years in the future.*" Int.'s Mem. Supp. Summ. J. at 3.

Defendants' and intervenor's arguments outlined above are supported by Agency practice. While the word "tentative" was added to the FDCA regulations after plaintiff's 1987 approval letter, the Agency's argument that this addition merely codified pre-existing policy warrants deference. The FDA's explanation that the 1992 regulations made explicit the policy followed since the passage of the Hatch–Waxman Amendments is buttressed by its statement in the preamble to the 1992 regulations: "[t]he regulations clarified that an approval with a delayed *effective* date is tentative and does not become final

until the effective date." 57 Fed.Reg. at 17967.

While the FDA did change the wording in its approval letters and modify the entries in the Orange Book, the changes between 1987 and 1992 do not amount to "arbitrary" or "capricious" treatment. That a federal agency tasked with approving drugs for release to the public should reserve the right to change the marketability date in the event of intervening circumstances is not arbitrary, but rational. Furthermore, because the word "approval" was left undefined by Congress, the Agency's interpretation should be afforded *Chevron* deference.

*B. Claim II: Are the Pediatric Exclusivity Provisions of the FDAMA Impermissibly Retroactive vis a vis Barr's ANDA?*

■ The pediatric exclusivity provision of the FDCA provides, in relevant part:

if the drug is the subject of a listed patent . . ., the period during which an application may not be approved under section 355(c)(3) or section 355(j)([5])(B) of this title shall be extended by a period of six months after the date the patent expires (including any patent extensions).

21 U.S.C. § 355a(c)(2)(A); *see also id.* § 355a(c)(2)(B)(same).

Plaintiff maintains that there are no circumstances under which the FDA can lawfully apply the pediatric exclusivity provisions to its ANDA. As the first premise for its argument, it claims that the language of the provisions themselves precludes their application to its product. Plaintiff alleges that, because its ANDA was approved ten years before the pediatric provisions were enacted, and twelve years before Astra submitted its research, the statute is inapplicable to its drug approval. Plaintiff points to the language above and states that, by referencing the period during

which an application "may not be approved," Congress is clearly referring to applications that have not yet received approval. Plaintiff also notes that the FDA is required to notify applicants "on a forward-looking basis" that their submissions and approvals "will be" subject to pediatric exclusivity. 21 U.S.C. § 355(a)(f). The prospective language would be unnecessary, argues plaintiff, if Congress meant to extend the effective date of all approved applications. Pl.'s Mem. Supp. Summ. J. at 20. Finally, plaintiff states that the FDA is only permitted to delay "approval" of an ANDA for up to ninety days while it determines whether pediatric studies are eligible for exclusivity. 21 U.S.C. § 355a(e). According to plaintiff, the "obvious purpose" of this provision is to prevent unapproved ANDAs from being approved while the FDA is conducting its review of pediatric research. Pl.'s Mem. Supp. Summ. J. at 20. In essence, plaintiff argues that the provisions in question evidence Congress' intent that pediatric exclusivity affect only the effective approval dates of those ANDAs that had not previously been approved. Plaintiff emphasizes that its certification changes are legally irrelevant to deciding whether the FDA approved its application in 1987. It maintains that intervenor Astra rests its certification argument entirely on the FDA's patent certification amendment regulation, 21 C.F.R. § 314.94(a)(12)(viii), and submits that this regulation has no relevance for the following reasons.

First, plaintiff maintains that the regulation is irrelevant because the FDA itself has noted that it has no impact on an ANDA and that it fulfills a purely administrative, non-substantive, "house-keeping" function. Pl.'s Sur–Reply Br. at 10, *citing Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1071 n. 13 (D.C.Cir.1998).

Second, plaintiff contends that the FDA did not rely on the regulatory provision in question when rendering its administrative opinion in this case. (*See* AR0001–7). Because an agency's action may only be upheld, if at all, on the basis articulated by the agency itself, the regulation cannot lawfully form the basis for upholding the FDA's decision. *See, e.g., SEC v. Chenery Corp.,* 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626; *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962), *cited in* Pl.'s Sur–Reply Br. at 10.

Third, plaintiff argues that is has not only demonstrated that the FDA does not interpret § 314.94(a)(12)(viii) as Astra proposes, but it has also proven that the FDA cannot lawfully adopt Astra's construction. The FDCA does not authorize the FDA to withdraw ANDA approval absent compliance with the Hatch–Waxman Amendments.

In addition, plaintiff argues that its 1993 patent certification is not necessarily relevant under the text of the FDCA. Plaintiff maintains that Astra itself does not dispute that the "only practical effect of Barr's 1993 patent certification was to 'reset the effective date of Barr's ANDA to August 20, 2002.'" AstraZeneca's Undisputed Material Facts at 1 (adopting FDA's Undisputed Material Facts at ¶ 9), *cited in* Pl.'s Sur–Reply Br. at 11.

Finally, plaintiff asserts that the FDA has a policy of applying the "filing and approval criteria in effect at the time of submission as the basis for approval of applications" filed before the effective date of its 1992 regulations. Pl.'s Sur–Reply Br. at 11, *citing Serono Labs. v. Shalala,* 158 F.3d 1313, 1322 (D.C.Cir.1998). Plaintiff maintains that, because it did not "resubmit" its entire ANDA, there is no statutory, regulatory, or precedential basis to suggest that revising its patent certification in 1993 revoked the agency's approval and brought plaintiff under the FDA's 1992 "tentative" approval scheme.

Plaintiff challenges defendants' contentions (1) that the only approvals that are not affected by subsequent grants of pediatric exclusivity are "final, effective approvals;"(2) that "if pediatric exclusivity is granted before an approval of an ANDA is effective, the earliest date on which the ANDA's approval can be made effective is 6 months after the patent expires;" and (3) that "applications that do not have an effective approval as of the grant of pediatric exclusivity must, if pediatric exclusivity is granted, have the effective date pushed back by six months after the patent ... expires." Plaintiff observes that the pediatric exclusivity provisions refer solely to *prospective* approval applications and that the FDA cannot "rewrite statutes at will." Plaintiff further argues that, under *Chevron,* an agency's interpretation is entitled to deference only if the statute is ambiguous and its interpretation reasonable. Plaintiff contends that, in the case at hand, the Agency has identified no ambiguity warranting the adoption of the its "unreasonable" interpretation. Pl.'s Mem. Supp. Summ. J. at 22. More fundamentally, because FDA's interpretation seeks to apply the pediatric provisions to an ANDA approved prior to their enactment, its statutory interpretation is entitled to no deference whatsoever. Plaintiff cites *Immigration and Naturalization Serv. v. St. Cyr,* stating that "(b)ecause a statute that is ambiguous with respect to retroactive application is construed under our precedent to be unambiguously prospective ... there is, for *Chevron* purposes, no ambiguity in such a statute for an agency to resolve." *Immigration and Naturalization Serv. v. St. Cyr,* 533 U.S. 289, 320 n. 45, 121 S.Ct. 2271, 2290 n. 45, 150 L.Ed.2d 347 (2001).

Plaintiff argues that, even if the pediatric exclusivity provisions could be interpreted in the manner the FDA proposes, they could not be applied to delay the effective date of its ANDA. First, Congress gave no "legislative expression" indicating such an intent. Second, applying the pediatric provisions to extend the effective date of Barr's previously-approved ANDA "would have an impermissible, retroactive effect within the meaning of Supreme Court precedent." Pl.'s Mem. Supp. Summ. J. at 23. Plaintiff cites the presumption against retroactivity in Supreme Court jurisprudence and notes that this presumption recognizes the "unfairness of imposing new burdens on persons after the fact." *Landgraf v. USI Film Prod.*, 511 U.S. 244, 265, 114 S.Ct. 1483, 1496, 128 L.Ed.2d 229 (1994). Stating that courts must receive clear indications from Congress before finding that statutes have retroactive effects, plaintiff notes that those cases where the Supreme Court has found "truly retroactive" effect "have involved statutory language that was so clear it could sustain only one interpretation." *Lindh v. Murphy*, 521 U.S. 320, 328 n. 4, 117 S.Ct. 2059, 2064 n. 4, 138 L.Ed.2d 481 (1997). Plaintiff maintains that the relevant statute is completely devoid of language directing the FDA to apply the pediatric exclusivity provisions retroactively. The severe economic effects of imposing an additional six-month delay to previously-approved ANDAs, maintains plaintiff, "are sufficiently 'retroactive' to require Congress to clearly specify that the law be applied retrospectively." Pl.'s Mem. Supp. Summ. J. at 17.

■ In addition to determining whether Congress has indicated a retroactive intent, plaintiff argues, courts must seek to determine whether application of the statutory provision would result in an impermissible retroactive effect. *See St. Cyr*,

533 U.S. at 320, 121 S.Ct. 2271. A statute has "retroactive effect" if it "attaches new legal consequences to events completed before its enactment" or "takes away or impairs vested rights acquired under existing laws." *Landgraf*, 511 U.S. at 269–70, 114 S.Ct. 1483; *see also St. Cyr*, 533 U.S. at 320, 121 S.Ct. 2271. Plaintiff maintains that in the present case:

> it is without question that applying the 1997 pediatric exclusivity statute to delay the effective date of Barr's ... ASNDA would 'take away or impair' Barr's final ANDA approval, including its vested right to begin marketing on August 20, 202, and would 'attach new legal consequences' to events that have already been completed.

Pl.'s Mem. Supp. Summ. J. at 25.

As discussed above, plaintiff alleges that it had a "vested right" to commence marketing on a specific date. Consequently, it argues that applying the pediatric exclusivity provision to its ANDA would " 'take away or impair' " its legal rights and " 'attach new legal consequences to events completed before [the FDAMA's] enactment.' " *Id.* at 25.

In response to plaintiff's retroactivity argument, defendants also cite the *Landgraf* case, which holds that a statute does not operate retrospectively "merely because it is applied in a case arising from conduct antedating the statute's enactment." *Landgraf*, 511 U.S. at 269, 114 S.Ct. 1483. Under *Landgraf*, a statute is considered to have retroactive effect only if "it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* at 280, 114 S.Ct. 1483. Defendants argue that, since plaintiff never had a "vested legal right" to market its *tamoxifen* product on a specific date, Astra's award of pediatric exclusivity "has

impaired no right, increased no liability, and imposed no new duty" on Barr Labs. Defs.' Mem. Supp. Summ. J. at 4.

Intervenor AstraZeneca claims that plaintiff's retroactivity argument is "pure bootstrapping." Int.'s Mem. Supp. Summ. J. at 15. Specifically, plaintiff's argument presupposes that its 1987 approval was final and concludes, consequently, that the FDA could not subject its ANDA to pediatric exclusivity. Astra maintains that, because plaintiff's approval was never more than tentative, the Agency did not err in applying pediatric exclusivity. Astra notes that the plaintiff recognized as much in its May 2002 SEC 10-Q, in which it referred to its ANDA as "approved" but noted that it had the right "to manufacture the 10mg tablet following the expiration of the patent and any period of pediatric exclusivity awarded to AstraZeneca." Int.'s Mem. Supp. Summ. J. at 15, *citing* AR at 0521.

Similarly to defendants, Astra contends that, in order to be considered retroactive, a statute must "attach new legal consequences to events completed before its enactment or take away or impair vested rights acquired under existing laws." Astra cites the Administrative Record to buttress its argument that plaintiff never even perceived *itself* as having a "vested right" to market *tamoxifen*. Astra quotes the following entry from the record:

> "In the interim, between the time of the Agency finding of safety and effectiveness and the time the approval became effective, the ANDA was subject to new patents listed, extensions of existing patents, changes in existing patent certifications, changes in labeling or formulation made by the innovator, and the applicant was responsible for ensuring continued compliance with ... requirements of approval."

Int. Mem. Supp. Summ. J. at 16–17, *citing* AR at 0003. Astra argues that, in the face of so many contingencies, plaintiff cannot seriously claim that it had even a "unilateral expectation" of an August, 2002 approval.

As with the 1987 regulations, plaintiff's retroactivity argument involves a pure question of law. Whether the 1997 pediatric exclusivity provision was impermissibly retroactive hinges entirely upon whether plaintiff's 1987 approval was final or merely tentative. As the latter is the case, and as plaintiff's approval date was dependent on intervening events, the 1997 law imposed no new duties and impaired no vested rights. Pursuant to the discussion regarding Claim I, because plaintiff's approval was tentative as a matter of law, and because plaintiff enjoyed no legal vested right in an August 2002 marketing date for *tamoxifen*, the Court is not persuaded by plaintiff's retroactivity argument.

*C. Claim III.: Can the FDA's "Tentative Approval" Regulation Lawfully Apply to Barr's ANDA?*

Plaintiff's argument with respect to this claim raises no new or unaddressed issues. Plaintiff states that the APA and controlling case law leave no room for doubt concerning retroactivity and cites the following APA provision:

> (T)he APA requires that legislative rules be given future effect only. Because of this clear statutory command, equitable considerations are irrelevant to the determination of whether the (agency's) rule may be applied retroactively; such retroactive application is foreclosed by the express terms of the APA.

*Georgetown Univ. Hosp. v. Bowen*, 821 F.2d 750, 757 (D.C.Cir.1987); *see also Nat'l Mining Ass'n v. Dept. of Labor*, 292 F.3d 849, 858 (D.C.Cir.2002), *cited in* Pl.'s Mem. Supp. Summ. J. at 26.

Plaintiff repeats the standards for determining retroactivity and reiterates its

opinion that subjecting its ANDA to the pediatric exclusivity provisions would impose upon it new duties and impair its existing rights. Once again, it states that nothing in the Hatch–Waxman Amendments "remotely suggests that Congress authorized retroactive rule-making, let alone establishes the 'express (grant of) congressional authority' required to enact retroactive rules." *Nat'l Mining Ass'n v. Dept. of Labor*, 292 F.3d at 859; *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988).

In addition, plaintiff argues that nothing in the FDA's 1992 regulations "requires" the agency to apply its tentative approval regulation retroactively. To the contrary, the preamble expressly states that the regulations did not become "effective [until] June 29, 1992," five years after the agency's approval of plaintiff's ANDA. Plaintiff avers that "(h)aving adopted a specific policy that its 1992 regulations do not apply retroactively, any attempt by FDA to abandon that policy without explanation would constitute arbitrary and capricious agency action." Pl.'s Mem. Supp. Summ. J. at 29.

While they do not explicitly respond to Claim III, defendants' and intervenor's positions on the relevant issues have been previously articulated. Both the defendants and the intervenor claim that the 1992 regulations were not retroactive because they were consistent with prior agency practice. The Court is persuaded by their arguments. Consistent with the Court's prior holdings, the Agency's interpretation of the 1985 and 1992 regulations is entitled to *Chevron* deference.

*D. Claim IV: Does the FDCA Independently Prevent the FDA from Altering the Finally Approved Status of Barr's ANDA?*

Plaintiff claims that any attempt to withdraw its approval and alter its right to commence marketing on August 20, 2002 would be unlawful under the FDCA. It notes that, pursuant to the FDCA, the FDA can only withdraw approval of an ANDA for limited reasons. These reasons include the following:

- clinical or other experience, tests, or other scientific data showing the drug is unsafe;

- a lack of substantial evidence that the drug will have the effect it purports or is represented to have;

- the patent information required by the Hatch–Waxman Amendments was not filed within the specified time;

- the application contains any untrue statement of a material fact;

- failure to establish or maintain a system for maintaining required records in accordance with FDA regulations;

- evidence that the methods used in, or the facilities and controls used for, the manufacture, processing, and packing of the drug are inadequate to assure and preserve its identity, strength, quality and purity; or

- evidence that the drug's labeling is false or misleading.

*See* 21 U.S.C. § 355(e). Furthermore, prior to withdrawing approval, the FDA must follow the procedures outlined in the statute and provide the applicant with notice and an opportunity to be heard. *Id.* The FDA does not argue that withdrawing its 1987 grant of final approval to plaintiff's ANDA under § 355(e) is either necessary or appropriate. Nor has the Agency provided plaintiff with a notice of withdrawal or a hearing. For these "independent" reasons, plaintiff maintains that the FDA cannot lawfully withdraw its approval of its *tamoxifen* ANDA.

Neither the defendants nor the intervenor respond explicitly to the arguments advanced under Claim IV. Nevertheless, they have made abundantly clear that they do not view plaintiff's ANDA as having been *withdrawn*. Because the approval of plaintiff's ANDA was a tentative approval, and subject to a delayed effective date, departures from the date listed in the original letter did not warrant the approval's complete withdrawal.

**Conclusion**

For the foregoing reasons, the plaintiffs' motion for summary judgment is **DENIED** and the defendants' and intervenor's motions for summary judgment are **GRANTED**. Precedent of longstanding requires the Court to defer to an Agency's interpretation of its organic statute. Having reviewed the FDA's actions in the present case, the Court is not persuaded that its interpretation of "final approval" amounts to arbitrary, capricious or otherwise unlawful action. Consistent with the Agency's interpretation of the FDCA's implementing regulations, its application of the pediatric exclusivity provisions to plaintiff is not impermissibly retroactive.

An appropriate Order accompanies this Memorandum Opinion.

### *ORDER AND JUDGMENT*

Pursuant to Fed.R.Civ.P. 58 and for the reasons stated by the Court in its Memorandum Opinion docketed this same day, it is by the Court hereby

**ORDERED** that plaintiff's motion for summary judgment is **DENIED**; and it is

**FURTHER ORDERED** that federal defendants' and intervenor's cross-motions for summary judgment are **GRANTED**; and it is

**FURTHER ORDERED** and **ADJUDGED** that the Clerk shall enter final judgment in favor of defendants and intervenor and against plaintiff, which judgment shall declare that defendants did not violate the Federal Food, Drug and Cosmetic Act ("FDCA") or act arbitrarily, capriciously and in a manner otherwise contrary to law under the Administrative Procedure Act ("APA").